UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

**Jeff Bousquet**

**On behalf of Himself and
all others similarly situated,**

    **Plaintiff,**

  v.                                               Case No. _____

**Eagle Disposal, Inc.,**

    **Defendant.**

---

## COMPLAINT
---

    Plaintiff, by his attorneys, for his Complaint against Defendant states as follows:

    1.    This is an individual and proposed collective action under the Fair Labor Standards Act; as well as an individual and proposed class action under Wis. Stat. §109.03(1) and (5) against Eagle Disposal, Inc. ("Eagle Disposal") to recover straight time and overtime wages that were unpaid because (a) Plaintiff was not permitted to punch in as soon as he began work, and was only paid starting when he later punched in; and (b) Eagle Disposal failed to include in the quarterly bonuses paid to its employees in the computation of the regular rate used to compute their overtime pay, even though those bonuses were well-known to the employees as rewards for acceptable work performance and attendance.

### JURISDICTION AND VENUE

    2.    This court has subject matter jurisdiction under 29 USC §216(b) and 28 U.S.C. §1331 because Plaintiff alleges violations of the FLSA, 29 U.S.C. §201 et seq; as well as supplemental jurisdiction over the Plaintiff's claims that arise under Wisconsin law in that the

1

Wisconsin law claims challenge the same policies and practices as the FLSA claims, and therefore arise out of a common nucleus of operative facts as the FLSA claims.

3. This Court has personal jurisdiction over Eagle Disposal pursuant to Rule 4(k)(1)(a) of the Federal Rules of Civil Procedure because Eagle Disposal is subject to the jurisdiction of a court of general jurisdiction in the State of Wisconsin, while the Eastern District of Wisconsin is located within Wisconsin.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because Eagle Disposal resides in the Eastern District of Wisconsin, while the violations at issue arise out of practices that occurred within this District.

## THE PARTIES

5. Named-Plaintiff Jeff Bousquet was employed as a Front Load Driver by Defendant Eagle Disposal. In that capacity Bousquet was responsible for picking up and delivering recyclable materials for Eagle Disposal's clients. Bousquet's FLSA consent form is being filed with the Court simultaneously with this Complaint.

6. Eagle Disposal is a waste disposal company operated out of its office and yard located in Franksville, Wisconsin. Eagle Disposal's business includes picking up and delivering trash for clients, picking up and delivering recyclables for clients, and delivering empty and picking up filled roll-off dumpsters for clients. At all relevant times Eagle Disposal employed, in addition to office personnel, front load drivers who picked up and delivered trash and recyclables, roll-off drivers who picked up and delivered roll-off dumpsters, and mechanics.

7. Eagle Disposal is an employer within the meaning of Wis. Stat. §109.03(1). At all relevant times between August of 2019 to the present, Eagle Disposal has had annual gross volume of sales of not less than $500,000.

## FACTS

8. Before Justin Springer became the supervisor of both the Front Load Drivers and the Roll-Off Drivers, Bousquet was free to pick the time when he started to be paid each day. He would punch in as soon as he arrived at the Eagle Disposal shop in Franksville, start to work as soon as he punched in, and punch out and leave once his work for the day was completed.

9. For each day, Eagle Disposal drivers, whether they were Front Load Drivers who picked up garbage or recyclables or Roll-Off Drivers who delivered and picked up roll-off dumpsters, had designated routes for pickups and deliveries.

10. Eagle Disposal assigned a truck to each Front Load or Roll-Off driver, which were stored at the Eagle Disposal yard overnight. Before starting their routes each day, each driver had to perform work on their trucks including checking tires, checking fluids, checking for leaks, checking brake pressure, and building up air pressure in their trucks. The drivers were unable to perform the pickups and deliveries on their routes without their trucks. Each driver typically needed 10-15 minutes per day to prepare their trucks to leave the Eagle Disposal yard in the morning.

11. On a daily basis, both Front Load and Roll Off Drivers would receive their daily work assignments on a tablet. The daily assignments would not become available until after the drivers completed their previous shift. Many drivers including Plaintiff would leave their tablets at the Eagle Disposal facility, so that they must come into the shop and pick up their tablets before beginning their routes.

12. Drivers including Plaintiff would review their daily work assignments before they leave for the day so that they could drive their route in the most time efficient manner, in case they had any questions about the location or directions for a pickup or delivery location, and so that

3

they can ask a manager whether a pickup can wait a day so that the route can be driven more efficiently.

13. After Justin Springer became the supervisor of both the Front Load Drivers and the Roll-Off Drivers, which upon information and belief occurred in May or June of 2022, Front Load drivers who were expected to leave the shop at 4:00 a.m. to begin their routes were not permitted to punch in before 3:55 a.m., Front Load drivers who were expected to leave the shop at 5:00 a.m. to begin their routes were not permitted to punch in before 4:55 a.m., while Roll-Off Drivers who were expected to leave the shop at 6:00 a.m. were not permitted to punch in before 5:55 a.m.

14. Unless they were attending a monthly meeting, Eagle Disposal Front Load drivers would on average arrive at the Franksville facility 30 minutes before when they were scheduled to leave on their routes. In advance of leaving for the route the drivers would complete their pre-trip inspections on their vehicles, build up air pressure, and review their work assignments on their tablets.

15. Because it is not possible for Roll-Off drivers to complete their pre-trip inspections on their vehicles, build up air pressure, and review their work assignments in five minutes, Roll-Off drivers had to arrive and begin working before 5:55 a.m. to leave from the Eagle Disposal facility to begin their routes at the expected departure time of 6:00 a.m.

16. On a daily basis, Springer would arrive at the Franksville facility by 3:40 a.m. to 3:45 a.m. He would drive through the Eagle Disposal parking lot before parking near the building door. Springer therefore would see drivers performing work on their trucks at 3:40 a.m. or 3:45 a.m., which was before the earliest time when they were permitted to punch in at 3:55 a.m.

17. On days when there was not a driver meeting at 3:30 a.m., drivers would sometimes approach Springer with questions about their daily assignments before leaving on their

4

routes. These conversations would often occur more than five minutes before the drivers were scheduled to leave to begin their routes.

18. Springer would meet once per month with the Front Load drivers at 3:30 a.m. On these days Front Load drivers were permitted to punch in by no earlier than by 3:25 a.m. Front Load drivers would still complete their pre-trip inspections and build up air pressure in their trucks in advance of the meeting, so that they could leave and begin their routes as soon as the meetings ended. Springer would witness the drivers driving their trucks out of the yard as soon as the meetings ended.

19. At all times after Springer implemented the policies described by paragraph 13 of the Complaint, Eagle Disposal used the Front Load and Roll-Off drivers' punch in times to compute their daily hours worked, so that the drivers were not paid for time after they began work and before they were allowed to punch in.

20. Eagle Disposal failed to provide its drivers with any mechanism to report to management that they began work more than five minutes before they were scheduled to leave and begin their routes; and failed to implement or enforce any policies that prohibited its employees from beginning to perform work before they punched in.

21. During the time period after Springer implemented the policies described by paragraph 13 of the Complaint, Plaintiff was regularly credited with and paid for working more than 40 hours per week, including receiving overtime pay for his hours worked over 40 per week.

22. Eagle Disposal Front Load drivers, Roll-Off drivers, and mechanics were eligible to receive bonuses.

23. Eagle Disposal would award bonuses to its drivers and mechanics unless there were deficiencies in their attendance or work performance that caused the bonuses to be withheld.

5

24. When a bonus was withheld, Eagle Disposal would put a document into the employee's file explaining what perceived deficiencies in the employee's work performance or attendance led to the withholding of the bonus.

25. Eagle Disposal employees would regularly discuss with each other their eligibility for, and criteria for receiving bonuses, so that Eagle Disposal's program of paying bonuses to employees so long as their work performance was satisfactory became well known to its employees; and so that the employees expected to receive the bonuses so long as their work performance and attendance were satisfactory.

26. Eagle Disposal did not include the bonuses in computing the regular rate for its employees that is used to compute their overtime pay.

## COLLECTIVE ACTION ALLEGATIONS

27. Plaintiff brings his First Claim for Relief, pursuant to the Fair Labor Standards Act, on his own behalf and on behalf of (a) all other similarly situated Front Load and Roll-Off Drivers of Eagle Disposal who were paid starting when they punched in rather than the earlier time when they began to perform work at the Eagle Disposal facility; and (b) all hourly employees of Eagle Disposal who received at least one bonus that was not included in computing their regular rate for overtime pay.

28. The First Claim for Relief for violations of the FLSA may be brought and maintained as an "opt-in" collective action pursuant to Section 16(b) of FLSA, 29 U.S.C. §216(b), for prospective members of the FLSA Class that are similarly situated to Plaintiff, in that the Court can determine on a uniform basis the legality of the timekeeping and overtime computation policies that Eagle Disposal uniformly applied to each of its drivers/hourly paid employees.

## CLASS ALLEGATIONS

29. Plaintiff seeks to represent the following two subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> (1) All Front Load and Roll-Off drivers employed by Eagle Disposal after Justin Springer implemented the policy that prohibited drivers from punching in more than five minutes before the top of the hour; and (2) All hourly employees who were employed by and received at least one bonus from Eagle Disposal during the time period of April 19, 2021 to the present.

30. The persons in the first subclass identified above are so numerous that joinder of all members is impracticable. At any given time, Eagle Disposal would employ approximately 35 Front Load and Roll-Off drivers. There have been at least six Front Load drivers who have left, and who have been replaced, since Springer implemented the policies described by paragraph 13 of the Complaint. The joinder of many class members is made even more difficult because they are current Eagle Disposal drivers who are economically dependent upon the Defendant; or because they are future employees of Eagle Disposal who may benefit from the declaratory relief requested by this Complaint.

31. There are even more members in the second proposed subclass, given that the second subclass also includes mechanics. The joinder of current and future Eagle Disposal employees into the second subclass is equally impracticable for the reasons explained in paragraph 30 of this Complaint.

32. There are questions of law and fact common to the Wisconsin Unpaid Wage Class (Rule 23 Class) including whether employers are required to pay for pre-shift work time when it provided the employee with no mechanism to report the pre-shift work time, whether alternatively Eagle Disposal can be charged with actual or constructive knowledge of its employees' pre-shift work time, whether the employees' performance of work on their trucks at the beginning of their shifts began their continuous workdays so that even breaks taken thereafter are compensable, and

7

whether bonuses that Plaintiffs received must be included in the regular rate used to compute their overtime pay.

33. Plaintiff's claims are typical of those of the Class in that he, just like each member of the proposed subclasses, was paid starting when he punched in rather than when he earlier began to perform work, and because he received bonuses that were well-known by the employees as rewards for acceptable attendance and work performance, and that was not included in the regular rate used to compute his overtime pay.

34. Named Plaintiff will fairly and adequately protect the interests of the Rule 23 class; and has retained counsel experienced in wage and hour litigation. There is also no antagonism between Named Plaintiff and other class members in that Eagle Disposal can equally modify its employee compensation policies to avoid future liability whether or not it also pays back wages to its employees.

35. Common questions as to Eagle Disposal's liability to class members will predominate over any individual questions of damages. Because Eagle Disposal failed to maintain accurate records of when its employees began to work each day, the typical start time for Eagle Disposal's drivers can be determined as a matter of just or fair inference through eyewitness and representative testimony. Eagle Disposal's own records, once supplemented by the employees' actual start times, can be used to compute damages for each class member.

36. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Damages sustained by class members pale in comparison to the costs of litigating their individual claims. A class action will permit the Court to resolve predominate legal questions that drive the resolution of this litigation, while obviating the need for

unduly duplicative litigation that might result in inconsistent judgments about the applicability and interpretation of the relevant laws.

**COUNT I.    CLAIM FOR UNPAID MINIMUM WAGE AND OVERTIME PAY UNDER THE FLSA.**

37.     Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs 1-36 of the Complaint.

38.     Eagle Disposal, through its Supervisor Springer, had actual notice that Plaintiff began to perform work before he was permitted to punch in because he saw Plaintiff perform work, and had conversations with Plaintiff about work before the earliest time that Plaintiff was permitted to punch in.

39.     Alternatively, because Plaintiff needed more than five minutes to complete the pre-trip inspections of his truck, to build up air pressure for his truck, and to pick up his tablet and review his daily work assignments, Eagle Disposal should have known that Plaintiff needed to start work before he was permitted to punch; so that he could leave the company yard and begin his route at the top of the hour to comply with company policies.

40.     Similarly, because Plaintiff had to complete the pre-trip inspection of his truck, build up the air pressure for his truck, and pick up his tablet and review his daily work assignments before the 3:30 a.m. monthly driver meetings, in order to be able to leave the yard to begin his route as soon as the drive meetings ended, Eagle Disposal at a minimum should have known that Plaintiff began work before the earliest time he could punch in at 3:25 a.m. on days when there were driver meetings at 3:30 a.m.

41.     Once Plaintiff began to perform work on his truck, his continuous workday started, so that any short breaks he took thereafter but before the top of the next hour were compensable.

9

Case 2:23-cv-00504-WED    Filed 04/19/23    Page 9 of 13    Document 1

42. Even though Eagle Disposal had actual or constructive knowledge that its drivers began to perform work before the earliest time that they were permitted to punch in, it failed to either promulgate or enforce any policies that prohibited its drivers from performing work before punching in. Nor did Eagle Disposal provide its drivers with any available mechanism to report the amount of time they spent performing work before they punched in.

43. Eagle Disposal therefore was required by the FLSA to count as hours worked the time between when Plaintiff began to perform work on his truck at the beginning of his workday, and when he punched in on the time clock.

44. Eagle Disposal paid quarterly bonuses to its employees with sufficient regularity to create an expectation amongst the employees that they would receive the bonuses if their attendance and work performance were acceptable.

45. Eagle Disposal treated the bonuses as a reward for acceptable attendance and work performance by paying them whenever the employees' work performance and attendance were deemed acceptable, and by maintaining documentation outlining the deficiencies in work performance and attendance that held to the withholding of a bonus in the employees' files.

46. The bonuses therefore were effectively announced to employees to induce them to improve and/or maintain the level of their attendance and work performance, so that the bonuses must be included in the regular rate.

47. Plaintiff would have received additional overtime pay if either he started to be paid when he began to work on his truck in the morning rather than at the top of the next hour, or if his bonuses were included in the regular rate used to compute his overtime pay.

48. Because Eagle Disposal does not have any legitimate justifications for its violations of the FLSA, Plaintiffs are entitled to 100% liquidated damages on all overtime wages owed to them.

49. Because Eagle Disposal was generally aware that it was obligated to pay its employees time and a half for their hours worked over 40 per week, yet failed to investigate the FLSA's requirements as to how to determine hours worked and compute overtime pay, anyone who opts into the proposed collective action is entitled to the application of a three years statute of limitations.

50. Plaintiff is additionally entitled to his reasonable attorneys' fees incurred in prosecuting this first cause of action.

**COUNT II: CLAIM FOR UNPAID WAGES BROUGHT PURSUANT TO §109.03(5).**

51. Plaintiff re-alleges, and incorporates by reference, the allegations contained in paragraphs 1-50 of the Complaint.

52. Eagle Disposal suffered or permitted its employees to perform work before the earliest time when they were permitted to punch in when it, despite having actual and/or constructive knowledge of such work, failed to either promulgate or enforce any policies that prohibited its employees from performing work before punching in.

53. Under Wisconsin law, all breaks under 30 minutes in duration that are not meal breaks must be paid, so that Plaintiff is entitled to be paid for any breaks that he took after he started to perform work and before he punched in.

54. Because Wisconsin law requires the payment of full rather than minimum straight time wages, Plaintiff is entitled to additional straight time pay at his regular pay rate for his unpaid work hours even if he did not work more than 40 hours during the week; and additional straight

11

and overtime pay for his unpaid work hours during any week in which he did work more than 40 hours during the week.

55. Because DWD §274.03 requires employers to compute its employees' overtime pay using the regular rate, thereby adopting the FLSA's definition of the regular rate, Plaintiff's bonuses must be included in the regular rate used to compute his Wisconsin law overtime pay, for the same reasons why the bonuses must be included in his regular rate under the FLSA.

56. By failing to pay all owed straight time and overtime wages owed to Plaintiff within 31 days of when the compensation was earned, Eagle Disposal violated Wis. Stat. §109.03(1), thereby entitling Plaintiff to file suit under §109.03(5) to recover straight time and overtime wages owed to him.

57. In such a lawsuit Plaintiff is also entitled to recover 50% liquidated damages on all unpaid wages as provided by Wis. Stat. §109.11(2), as well as his attorneys' fees and costs of prosecuting his Wisconsin wage claims as authorized by Wis. Stat. §109.03(6).

WHEREFORE, Plaintiff respectfully request the Court to enter an order that:

a. Finds that Eagle Disposal is liable to him, along with all persons who timely join the collective action, all overtime wages owed to them under the FLSA, plus an equal amount as liquidated damages, plus his market value attorneys' fees and costs incurred in prosecuting this claim;

b. Finds that Eagle Disposal is liable to him, along with all persons who do not timely exclude themselves from the proposed class action, all overtime wages owed to them under Wisconsin law, plus 50 percent of the owed wages as liquidated damages, plus his market value attorneys' fees and costs incurred in prosecuting this claim;

c. Declares that on an ongoing basis Eagle Disposal must begin to pay its drivers when they begin to perform work rather than when they later punched in; and that bonuses that Eagle Disposal pays to its employees must be included in the regular rate used to compute their overtime pay; and

d. Grants to him such further relief as the Court deems just and proper.

Dated this 19th day of April, 2023.

/s/Yingtao Ho_____
Yingtao Ho
Email: yh@previant.com
Attorney for Plaintiffst
The Previant Law Firm S.C.
310 W. Wisconsin Avenue, Suite 100MW
Milwaukee, WI 53203
Telephone: 414-271-4500
Fax: 414-271-6308