UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JEFF BOUSQUET,

                Plaintiff,

     v.                                         Case No. 23-CV-504

EAGLE DISPOSAL, INC.,

                Defendant.

---

## DECISION AND ORDER

**1. Background**

Jeff Bousquet drove a garbage truck for Eagle Disposal, Inc. He alleges that he and his coworkers were not paid for time they spent inspecting their trucks before punching in. He also alleges that they were not paid overtime at the correct rate because the overtime rate did not take into account bonuses they received.

An employee may bring an action under the Fair Labor Standards Act (FLSA) on behalf of himself and "other employees similarly situated." 29 U.S.C. § 216(b). Unlike a class action under Rule 23, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). In other words, unlike

a class action where a class member is included unless he opts out, in an action under the FLSA (referred to as a collective action) a member of the collective is excluded unless he opts in. *Fares v. H, B, & H, LLC*, No. 21-CV-753, 2022 U.S. Dist. LEXIS 3930, at *3 (E.D. Wis. Jan. 7, 2022) (citing *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982)).

The FLSA does not specify how courts are to process collective actions. Nor has either the Supreme Court or the Court of Appeals for the Seventh Circuit weighed in on how district courts must manage these actions. *Fares*, 2022 U.S. Dist. LEXIS 3930, at *3. Thus, courts are given much flexibility. *De Leon v. Grade A Constr. Inc.*, No. 16-cv-348-jdp, 2017 U.S. Dist. LEXIS 71849, at *4 (W.D. Wis. May 11, 2017) (quoting *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008)).

Courts have generally adopted a two-step approach, the first of which is conditional certification. *De Leon*, 2017 U.S. Dist. LEXIS 71849, at *4. At the conditional certification stage the "plaintiff must make a minimal showing that individuals in the potential class are similarly situated." *Waller v. AFNI, Inc.*, No. 20-cv-1080-JES-JEH, 2020 U.S. Dist. LEXIS 212570, at *4 (C.D. Ill. Nov. 13, 2020) (quoting *Brashier v. Quincy Prop., LLC*, No. 3:17-CV-3022, 2018 U.S. Dist. LEXIS 68948, 2018 WL 1934069 (C.D. Ill. Apr. 24, 2018)). "This first step is a lenient test: 'a court requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *De Leon*, 2017 U.S. Dist. LEXIS 71849, at *5 (quoting *Jirak*, 566

F. Supp. 2d at 848). "To establish that factual support, the plaintiff may present affidavits, declarations, deposition testimony, or other documents that 'demonstrate some factual nexus between the plaintiff and the proposed class or a common policy that affects all the collective members.'" *Tom v. Generac Power Sys.*, No. 17-C-1413, 2018 U.S. Dist. LEXIS 130629, at *8-9 (E.D. Wis. Aug. 3, 2018) (quoting *Ehmann v. Pierce Mfg.*, No. 16-C-247, 2016 U.S. Dist. LEXIS 141894, at *6 (E.D. Wis. Oct. 12, 2016)) (internal quotation marks omitted).

"Although the 'modest factual showing' standard is lenient, it is not a 'mere formality.'" *Tom*, 2018 U.S. Dist. LEXIS 130629, at *9 (quoting *Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 U.S. Dist. LEXIS 68942, at *9 (E.D. Wis. Sep. 11, 2008)). It falls somewhere in between the plausibility standard under Rule 12(b)(6) and the reasonably likely standard under Rule 56, but it is less stringent than the class certification under Rule 23, *Lee v. Children's Place Retail Stores, Inc.*, No. 14 C 3258, 2014 U.S. Dist. LEXIS 145787, at *14 (N.D. Ill. Oct. 8, 2014).

At the second step, which occurs after the parties have engaged in discovery, the court undertakes a more searching analysis of the similarities among the opt-in plaintiffs. *Waller*, 2020 U.S. Dist. LEXIS 212570, at *4.

Although the parties have undertaken some discovery, this action is at the first step with Bousquet asking the court to conditionally certify his claim under the Fair

Labor Standards Act (FLSA) as a collective action. (ECF No. 19.) He asks the court to certify two collectives:

> (1) All drivers who worked for Eagle Disposal on or after July 1, 2022 who turned on their trucks at an earlier time than when they began to be paid for the day; and (2) all drivers and mechanics who received a bonus from Eagle Disposal on or after October 3, 2020, three years before the date Plaintiffs are filing this motion for conditional certification.

(ECF No. 20 at 1.)

### 2. Drivers Working Before Punching In

Eagle employed two categories of drivers. Front-load drivers worked a generally fixed route. Roll-off drivers did not have fixed routes but delivered and picked up customers' refuse bins on an as-needed basis. (ECF No. 21, ¶ 4.) Front-load drivers would generally start at 4:00 AM (ECF No. 21, ¶ 11) although they could choose to start any time between 4:00 AM and 5:00 AM (ECF No. 26 at 10). Roll-off drivers could start any time between 5:00 AM and 6:00 AM, although in winter they might start an hour or two later due to decreased customer demand. (ECF No. 26 at 11.) Bousquet was a front-load driver. (ECF No. 21, ¶ 4.)

Eagle required all drivers to perform a pre-trip inspection of their truck. (ECF No. 21, ¶ 7.) This inspection required the driver to turn on the truck, turn on and check the truck's hydraulic systems, review the truck's indicator lights, test the air brakes, and walk around the truck to check the lights, tires, engine, fluids, and brakes. (ECF Nos. 20 at 5-6; 21, ¶ 8.)

In July 2022 Eagle changed its policies to prohibit any driver from punching in more than five minutes before the scheduled start of his shift. (ECF No. 21, ¶ 6.) Eagle's prior policy of allowing drivers to punch in and start work whenever they wanted (ECF No. 21, ¶ 11) led to drivers picking up garbage in the wee hours, resulting in complaints from customers and neighbors about the noise of the trucks (ECF No. 26 at 11). A driver who started too early could also find himself idled because mechanics were not available to make repairs until 6:00 AM or because the landfill was not yet open by the time he was ready to offload his truck (ECF No. 26 at 11-12).

Bousquet contends that, when Eagle made this policy change, it changed only the time employees could punch in; it did not instruct employees that they also had to change the time they started work. (ECF No. 41 at 5, 9.) As a result, drivers would start work when they arrived at Eagle but not punch in until five minutes before their start time. Because Eagle compensated employees based on the time clock records, an employee who started work before punching in was not paid for that time.

Bousquet submitted a declaration wherein he states that he would routinely arrive at Eagle before the 4:00 AM start of his shift. (ECF No. 21, ¶ 14.) He states, "By 3:40 a.m. or 3:45 a.m., there would be many other drivers who had turned on their trucks, were walking around their trucks to perform their pre-trip inspections, and/or were pumping their brakes to check the brakes." (ECF No. 21, ¶ 12.) He further states, "I would see other drivers, just like myself, turn on our trucks and perform our pre-trip

5

inspections before the driver meeting was scheduled to start." (ECF No. 21, ¶ 14.) His supervisor, Justin Springer, allegedly would have seen Bousquet and others performing these sorts of inspections when he arrived at work (ECF No. 21, ¶ 13), but he never told Bousquet or any other employee not to work before punching in (ECF No. 21, ¶ 6). Bousquet also points to Eagle's records showing that trucks were routinely turned on before the driver's scheduled start time and argues that "drivers are entitled to be paid starting when they turned on their trucks." (ECF No. 20 at 4.)

Bousquet argues that Eagle's records prove that drivers would routinely begin work before punching in. He points to timeclock records and records of when individual trucks were started. Because a driver typically drove the same truck every day (ECF No. 26 at 10), Bousquet argues that every instance of a truck being started before the truck's driver punched in is proof that the driver started work before punching in. According to Bousquet, a driver starting a truck marks the beginning of the driver's pre-trip inspection and thus equates to the driver starting work. (ECF No. 20 at 8 ("Documents that Eagle Disposal produced during discovery confirmed that Bousquet would start his truck (and therefore begin his pre-trip inspection on his truck) before he punched in."); 20 at 10 ("Second, documentation that Eagle Disposal produced to Plaintiffs shows that by January of 2023, both Front-load and Roll-off drivers were turning in [sic] their trucks, and therefore performing pre-trip inspections before they punched in.."); 20 at 11 ("Other Eagle Disposal drivers therefore would, just

like Plaintiff, turn on their trucks, in the company yard, as a part of performing pre-trip inspections on their trucks.").)

Eagle responds that Bousquet's premise is wrong. (ECF No. 26 at 16.) Eagle contends that drivers would routinely start their trucks when arriving at Eagle not to begin an inspection but so the cab would have time to either warm up or cool down before the driver began work. (ECF No. 26 at 12.) It also argues that it would be illogical for a driver to conduct a pre-trip inspection before punching in. Eagle expected to compensate drivers for time spent on pre-trip inspections. It did not impose deadlines by which a driver must leave the Eagle lot. (ECF No. 26 at 20.) Nor did it discourage drivers from working more than 40 hours per week. To the contrary, drivers were expected to work overtime. (ECF No. 26 at 20.)

Eagle has submitted affidavits from seven drivers who deny having ever done any work, including a pre-trip inspection, before punching in. (ECF Nos. 34, ¶ 9; 35, ¶ 12; 36, ¶ 10; 37, ¶ 12; 38, ¶ 9; 39, ¶¶ 10-11; 40, ¶ 10.) Although they reported starting their trucks before punching in (and having seen others do the same), they denied ever seeing another driver conducting a pre-trip inspection before the scheduled start of their shift. (ECF Nos. 34, ¶ 10; 35, ¶ 12; 36, ¶ 11; 37, ¶ 13; 38, ¶ 10; 39, ¶ 12; 40, ¶ 11.) Justin Springer, the supervisor of the front load drivers, also avers that he never saw any driver conducting an inspection when he arrived, typically between 3:40 and 3:45 AM. (ECF No. 28, ¶ 17.)

7
Case 2:23-cv-00504-WED   Filed 01/29/24   Page 7 of 16   Document 44

According to Eagle, Bousquet was a rogue employee who chose to perform a pre-trip inspection of his truck before punching in, in violation of Eagle's policy requiring every employee to record all time worked. Therefore, he is not similarly situated to any other employee.

In reply, Bousquet largely pivots from his argument that turning on the truck necessarily marked the driver starting work. Instead, in an effort to show that drivers must have been working before punching in, he compares timeclock entries to another data point—the time the trucks left Eagle's lot. He notes that trucks were frequently recorded as leaving Eagle's lot within a few minutes of the driver punching in. It would have been impossible for the driver to punch in, go to his truck, spend the 10 to 15 minutes necessary to complete a pre-trip inspection (ECF No. 18, ¶ 10), and drive out of the lot in this short time frame.

Without more, a driver turning on a truck to allow the cab to warm up or cool down for the comfort of the driver is not "work of consequence performed for an employer," *see Chagoya v. City of Chi.*, 992 F.3d 607, 618 (7th Cir. 2021) (quoting 29 C.F.R. § 790.8(a)), but rather is a preliminary activity performed for the benefit of the employee alone. Having said that, the parties agree that a pre-trip inspection is integral and indispensable to a driver's principal activity and thus constitutes compensable work under the FLSA.

As for Bousquet's argument that the timeclock and departure records prove that drivers must have been performing pre-trip inspections before punching in, that is only one reasonable inference. Another reasonable inference is that drivers were foregoing pre-trip inspections. Although Eagle required drivers to conduct a pre-trip inspection, Eagle also required drivers to record all time worked (ECF No. 27-1 at 27). It is no more logical that drivers would violate one policy over another. But at this stage it is not for the court to assess which of Eagle's policies drivers were violating. It is enough that one reasonable inference supports Bousquet's claim.

Bousquet's assertions that he observed other drivers routinely engaged in activities that he regarded as consistent with a driver's pre-trip inspection also tends to support his claim that there are other similarly situated employees. However, standing alone, his professed observations are insufficient to sustain his burden. *See Tom*, 2018 U.S. Dist. LEXIS 130629, at *17. As Eagle notes, Bousquet's declaration "seems to be intentionally vague," in that he asserts having observed other drivers "walking around their trucks" or "pumping their brakes." (ECF No. 21, ¶ 12.) He does not point to any driver having engaged in any action that is necessarily part of a pre-trip inspection.

Bousquet has not presented an affidavit of any similarly situated employee who attests to having performed a pre-trip inspection before punching in. Although this is a routine way in which a plaintiff attempts to make the requisite minimal showing, *see Malicki v. Leman U.S.A., Inc.*, No. 17-CV-1674, 2019 U.S. Dist. LEXIS 26402, at *7 (E.D.

Wis. Feb. 20, 2019), employee affidavits are not required for the plaintiff to sustain his burden. To require such proof would put the cart before the horse. Notice following conditional certification is how plaintiffs identify other affected employees; plaintiffs do not need to identify other affected employees to obtain conditional certification.

However, Eagle submitted an affidavit from Paul Mahon (another front-load truck driver) who says that, following Eagle's adoption of the five-minute policy, there were days when he would perform his pre-trip inspection before punching in, contrary to the instructions of his manager, because he wanted to get his route completed as soon as possible. (ECF No. 33, ¶ 12.)

Taken as a whole (Bousquet's observations, Mahon's affidavit, and the timeclock and departure records), the record supports the conclusion that there were drivers other than Bousquet who would perform work in the form of a pre-trip inspection of their trucks before punching in.

But for the court to conditionally certify a collective action, the plaintiff generally must "reasonably demonstrate that [he] and the putative class members were victims of a corporate decision, policy or plan." *Hadley v. Journal Broad. Grp., Inc.*, No. 11-C-147, 2012 U.S. Dist. LEXIS 19452, at *3 (E.D. Wis. Feb. 15, 2012) (citing *Howard v. Securitas Sec. Servs., USA*, No. 08 C 2746, 2009 U.S. Dist. LEXIS 3913, at *7 (N.D. Ill. Jan. 20, 2009)); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003) (citing cases). Isolated violations of the FLSA or individual employee decisions to work without being

paid do not suggest the existence of a corporate decision, policy, or plan. *Flores*, 289 F. Supp. 2d at 1046.

Bousquet points to Eagle's policy of prohibiting drivers from punching in more than five minutes before their scheduled start time as the relevant policy. However, he has failed to establish a sufficient basis for believing that the policy led to drivers performing pre-trip inspections before punching in. Eagle did not, for example, have a policy requiring drivers to leave the yard by a certain time such that it was impossible for a driver to comply with both policies without doing the pre-trip inspection before punching in. Bousquet made such an allegation—*e.g.*, that drivers could not punch in before 4:55 AM but were required to leave the yard by 5:00 AM—in his original complaint (ECF No. 1, ¶ 13), but he omitted it from his amended complaint (ECF No. 17.)

The disconnect between Eagle's five-minute policy and drivers allegedly performing pre-trip inspections before punching in is underscored by scrutinizing the departure records Bousquet submitted. Many of the drivers who reportedly left the yard within a few minutes after punching in had punched in well after their start times. (ECF No. 41 at 3.) For example, roll-off driver Charles Butt started his truck at 5:36 AM, punched in at 5:54 AM, and left the lot at 6:00 AM. (ECF No. 41 at 3.) Roll-off drivers are permitted to start work between 5:00 AM and 6:00 AM. The five-minute policy meant only that Butt could not punch in before 4:55 AM; it would not have prevented him

from punching in before or immediately after he turned on his truck at 5:36 AM.[1] In only five of the ten examples Bousquet offers was the truck turned on more than five minutes before the driver's allowed start time.[2] (ECF No. 41 at 3.)

At most the record suggests that certain drivers may have disliked Eagle's five-minute policy because it forced them to work later in the day. To complete their workday earlier, they performed their pre-trip inspections before punching in, enabling them to leave the yard immediately after punching in. Without more, the fact that Eagle set a minimum start time for employees is not the sort of policy that can give rise to conditional certification of a collective action under the FLSA. There was nothing about the five-minute policy that could be expected to give rise to employees working before punching in. The record demonstrates that Bousquet was an employee who, for his own interests, chose to disregard Eagle's policies and work before punching in. He is not similarly situated to the proposed collective. Therefore, the court will deny his motion to conditionally certify a collective with respect to drivers who began work by conducting a pre-trip inspection before punching in.

---

[1] The proffered records reflect winter months, and there is evidence that roll-off drivers might begin work later in winter months. But this possibility still would not tend to suggest that the five-minute policy resulted in roll-off drivers performing pre-trip inspections before punching in. Notably, only one roll-off driver punched in within five minutes of the top of the hour. (ECF No. 41 at 3.)

[2] One driver, Raymond Edwards, reportedly punched in five minutes *after* he left the yard. (ECF No. 41 at 3.)

### 3. Overtime Rate for Drivers and Mechanics

An employer must compensate an employee "at a rate not less than one and one-half times the regular rate at which he is employed" for any time worked in excess of 40 hours per workweek. 29 U.S.C. § 207(a). Subject to eight exclusions, an employee's regular rate "include[s] all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). The regular rate includes bonuses unless the bonus is "determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." 29 U.S.C. § 207(e)(3); 29 C.F.R. § 778.211(c); *Gilbertson v. City of Sheboygan*, 165 F. Supp. 3d 742, 749-50 (E.D. Wis. 2016).

Eagle has issued three types of bonuses. Annual Christmas bonuses were unrelated to a driver's performance. (ECF No. 26 at 15.) A one-time bonus was given to all employees in April 2022. (ECF No. 26 at 15.) And it issued five performance-based bonuses between July 2022 and September 2023.

Eagle asserts that its bonuses were discretionary and, therefore, it paid overtime at the correct rate. (ECF No. 26 at 22, fn. 10.) For purposes of Bousquet's motion for collective certification, it acknowledges that Bousquet was similarly situated to all drivers. It disputes, however, that Bousquet is similarly situated to mechanics because their bonuses were awarded in consideration of additional criteria that were assessed by different managers. It argues, "Bousquet has offered no basis to conclude that discretion

13

Case 2:23-cv-00504-WED   Filed 01/29/24   Page 13 of 16   Document 44

was not used in awarding these bonuses to mechanics or that mechanics were not paid the correct rate. As such, his claim that mechanics are similarly situated is unsupported." (ECF No. 26 at 23.)

Eagle also argues that any collective must be limited to the period July 2020 through September 2023. (ECF No. 26 at 22.) However, as Bousquet notes in reply, Eagle does not explain why.

Whether Eagle was required to account for the bonuses when calculating employees' overtime rates is not a question that is properly before the court on a motion for conditional certification. Bousquet has adequately demonstrated that he is similarly situated to both drivers and mechanics who received bonuses, notwithstanding the fact that supervisors assessed the mechanics' eligibility for bonuses by considering slightly different criteria that were better suited to the job of a mechanic than a driver. *See Weninger v. Gen. Mills Operations LLC*, 344 F. Supp. 3d 1005, 1013 (E.D. Wis. 2018) (granting motion for conditional certification regarding overtime pay rates despite evidence that "bonus plans were slightly different at different facilities"). Similarity is appropriately assessed more broadly—both drivers and mechanics were allegedly awarded bonuses based on performance related criteria and Eagle did not consider those bonuses in fixing the employees' overtime pay rate. An alleged "general practice of failing to include non-discretionary bonuses in employees' regular rates of pay when calculating overtime pay," bolstered by the plaintiff's factual assertions regarding his

14

own pay rate, are all that is required at this stage. *See Slaaen v. Senior Lifestyle Corp.*, No. 18-CV-1562-JPS, 2019 U.S. Dist. LEXIS 61041, at *6 (E.D. Wis. Apr. 9, 2019).

Therefore, the court will grant Bousquet's motion to conditionally certify a collective comprised of "all drivers and mechanics who received a bonus from Eagle Disposal on or after October 3, 2020, three years before the date Plaintiffs are filing this motion for conditional certification." (ECF No. 20 at 1.)

### 4. Sufficiency of Proposed Notice

The court having concluded that conditional certification is not appropriate as to "[a]ll drivers who worked for Eagle Disposal on or after July 1, 2022 who turned on their trucks at an earlier time than when they began to be paid for the day," the proposed notice must be amended to omit any reference to that proposed collective.

Eagle also argues that "the 'Description of the Lawsuit' section goes beyond what is necessary to inform the class and should be more narrowly tailored." (ECF No. 26 at 23.) That sentence is the extent of Eagle's argument; it does not further argue how the notice should be modified.

Undeveloped arguments are forfeited. *United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008). Having reviewed the "Description of the Lawsuit" section of Bousquet's proposed notice (ECF No. 19-1), aside from discussing Bousquet's unpaid work claim, nothing requires material alteration. Eagle does not otherwise object to the class notice.

Therefore, within 21 days of the date of this order, Bousquet shall submit an amended proposed notice that is consistent with the court's decision.

**IT IS THEREFORE ORDERED** that Bousquet's motion for conditional certification is **granted in part**. It is granted with respect to "all drivers and mechanics who received a bonus from Eagle Disposal on or after October 3, 2020, three years before the date Plaintiffs are filing this motion for conditional certification" and denied in all other respects.

**IT IS FURTHER ORDERED** that within **21 days** of the date of this order Bousquet shall submit an amended proposed notice that is consistent with this decision.

Dated at Milwaukee, Wisconsin this 29th day of January, 2024.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge